ESTHER SMEAD, Appellee, v. CLARENCE M. STEARNS et al.,
Appellants.

**FRAUD: Defenses—Shifting Responsibility for Performance of Con-**
1  **tract—Subscription Contest.** One may not turn over to a third
party of his own choosing the performance of his contract obliga-
tions and thereby escape responsibility for resulting fraud. So *held*
where a publisher organized a newspaper subscription contest,
offered a valuable prize to the most successful contestant, under
rules forbidding the purchase of votes, and later, with the acquies-
cence of the contestants, turned the matter over to third parties,
who recognized and counted votes cast in violation of the rules of
the contest.

**FRAUD: Defenses—Acquiescence in Performance of Contract by**
2  **Third Party—Effect.** Acquiescence of one party to a contract
that performance of the contract be made by third persons does
not estop such acquiescing party from objecting to the fraud of
such third parties in assuming to perform the contract. So *held*
in a newspaper subscription contest.

**CONSPIRACY: Evidence—Newspaper Subscription Contest—Fraud-**
3  **ulent Casting of Ballots.** Circumstantial evidence may be suffi-
cient to establish the existence of a conspiracy. So *held* where
the charge was that the promoter of a subscription contest con-
spired with a supposedly disinterested committee to count ballots
cast in violation of the rules of contest.

**PLEADING: Issue, Proof and Variance—Quantum of Proof—Breach**
4  **of Contract—Conspiracy.** A party shall not be compelled to
prove more than is necessary to entitle him to the relief asked for.
So *held* and applied where plaintiff pleaded (a) a violation by
defendant of the terms of his contract and (b) a conspiracy to
violate such contract. (Sec. 3639, Code, 1897.)

**EVIDENCE: Opinion Evidence—Value—Automobile—Local Value.**
5  It will be presumed, in the absence of evidence to the contrary,
that the value of a new automobile of a certain make is uniform
throughout a county.

**TRIAL: Instructions—Form, Requisites and Sufficiency—Correct but**
6  **Not Explicit—Waiver.** If instruction is correct, as far as it
goes, though not as explicit or limited as desired, request must be
made for the more explicit or limited instruction, or the right
thereto, if it exists, will be waived. So *held* where the court did
not define the words ''fraud'' and ''fraudulent''.

**FRAUD:** Elements of Fraud—Violation of Contract Relations—Sub-
7   scription Contest—Fraudulent Ballots. A newspaper publisher
who organizes a subscription contest, in order to increase the list
of his *bona fide* subscribers, and offers a valuable prize to the
contestant securing, under prescribed rules, the largest number of
votes, assumes contract relations with all those who in good faith
enter such contest, and is liable in damages to a successful con-
testant who is deprived of the offered prize by the reception and
counting of fraudulent ballots.

*Appeal from O'Brien District Court.*—WILLIAM HUTCHINSON,
Judge.

THURSDAY, DECEMBER 16, 1915.

THE opinion states the case.—*Affirmed.*

*Lindsay & Phelps,* for appellants.

*I. N. McIntyre* and *Herrick & Herrick,* for appellee.

WEAVER, J.—At the time of the transaction out of which
this litigation has arisen, the defendant Stearns owned the
"Sheldon Mail", a weekly newspaper published at Sheldon,
Iowa. His subscription list not being large enough to enable
him to compete for the county printing, he undertook to
increase it by inaugurating a so-called "popularity contest".
According to the plan of the contest, candidates entering it
were expected to canvass for both new and renewal subscrip-
tions to the paper, and to collect past due subscription ac-
counts, and were to be credited with "votes" on the basis of
the following scale: one vote for each one cent collected on
past due accounts, two votes for each one cent collected on
renewal subscriptions, and five votes for each one cent col-
lected on new yearly subscriptions. The candidate receiving
the highest number of votes thus obtained was to receive a
new Ford automobile. In publishing this offer and plan, the
defendant further announced that "no votes can be bought
or otherwise secured" except in the manner above outlined.
Candidates were directed to secure the necessary blanks at the
defendant's office. The contest was to open on August 2, 1912,

and close in about six or eight weeks. Later, the time for closing was set for October 19, 1912. Numerous candidates entered the race, but it soon developed that the real contest was between the plaintiff and Miss Grace Cole and perhaps one other. The state of the vote was published in the paper each week. The automobile to be awarded to the winner was publicly exhibited, and set apart to await the result. The candidates received from defendant blank receipts to be filled and delivered to the subscriber, and also other blanks, each of which was entitled, "Ballot for Mail Auto Contest, Sheldon, Iowa", to be filled with a statement of the several amounts collected, names of persons paying the same, the dates from which and to which the subscription was paid, the number of votes thus earned, and the name of the candidate for whom they were to be counted. Attached to this was an additional slip or blank, also marked "Ballot", in the following form:

### "BALLOT.

"Renewal ............... Amount $...........
"Arrears ............... Amount $...........
"New .................. Amount $...........
"Total Votes ........... Total Amount........
"Send paper to ...............................
          "Address ...........................
"Votes for ................................."

It does not clearly appear which of these forms was to be used in the final count. It is probable, however, that the latter was used for that purpose, while the defendant retained the former as his own check upon the correctness of the account. We think, however, that it is entirely immaterial which form of blank was intended to be voted; as both, when filled out, contained substantially the same matter. On Thursday, October 17, 1912, the plaintiff, and presumably the other contestants also, appeared at the defendant's office to report their work up to that date. Up to and including

this occasion, the defendant personally received the reports, the money and the votes from the candidates. On the evening of that day, he placed the votes so reported and settled for in a ballot box, and left it in the custody of one Collins, to be held by him until the time for the canvass, on Saturday evening. The box was locked and the key retained by the defendant. As we understand the record, Collins was authorized to continue the receipt of additional votes, but each vote so received was to be accompanied by the money representing the same; and he did in fact receive and deposit votes, including the ten disputed ballots hereinafter referred to. When the hour arrived, and the ballot box was finally closed, it was placed in the hands of three persons selected by the defendant for that duty, together with Collins, who acted as clerk. Among the ballots found in the box were ten containing ten dollars each, each ballot being entirely blank, except a direction or request that the votes represented by the sum be counted for Miss Cole. There was nothing on any of the ten ballots to indicate the names or addresses of the subscribers paying the money, or whether the money so paid was for new or renewal or past due subscriptions. A copy of the ballot is hereinafter printed in full. The plaintiff, with her husband, who was present, protested these ballots, as did also a third contestant; but they were finally counted and treated as having been collected upon new subscriptions, thus increasing by 50,000 the vote for Miss Cole. The canvass so made showed an aggregate vote as follows: For Miss Cole, 132,335; for Mrs. Smead (plaintiff), 86,845. Miss Cole was thereupon declared the winner and awarded the prize. It will be seen from this statement that, if the protested ballots had been disallowed, plaintiff would have led Miss Cole by a plurality of 4,510 votes.

Upon the matters thus far stated, there is no substantial dispute in the record. Other related facts which are the subject of more or less controversy will be mentioned later.

The plaintiff's petition sets out the circumstances which

we have here recited, and further alleges that defendant conspired with the father of Miss Cole to make it appear that his daughter had won the contest; and, in furtherance of such fraudulent scheme, defendant, in consideration of $100 paid him by Cole, permitted the latter to cast the 50,000 votes, which did not in fact represent *bona fide* subscriptions or collections obtained for the paper, and thereby fraudulently increased the vote for Miss Cole by that amount, giving her an apparent plurality, when, in fact, the plurality of valid ballots was in favor of plaintiff. Because of the matters so alleged, plaintiff claims damages for the value of the automobile, with interest and costs.

The defendant denies the petition, and affirmatively pleads the delivery by him of the ballot box to Collins on the evening of October 17, 1912, as already stated, and further says that such delivery was made with the statement on his part that "my responsibility ceases"; and that thereafter neither the box nor its contents were in his possession or under his control at any time until the contest was over and the result declared. He further alleges that the judges of the contest counted the ballots, "using their own discretion as to what ballots should or should not be counted, and at no time were advised or directed by said Stearns" with reference thereto. It is also alleged that the contestants, including the plaintiff, "expressly, or by implication through acquiescence, consented to the delivery of the ballot box and contents to the judges and made no objection to said disinterested parties as judges of said contest, and, by becoming such contestants, consented to their acts in counting said ballots as they should see fit". A demurrer was filed to the affirmative defense so pleaded, but does not appear to have been ruled upon.

Upon the trial, the testimony, in addition to the conceded facts already mentioned, related very largely to what took place on the evening of October 19, 1912, when the votes were canvassed. This testimony, when given the most favorable construction of which it is fairly susceptible in support

of the verdict, tends to show that the ballots were taken from the box and separately and publicly read and a tally thereof kept by the clerk. When the ten ballots now in question were read, they were then and there protested by the plaintiff and by a third contestant, on the ground that they showed nothing but a mere payment of money, without any evidence that such payment represented subscriptions for the paper. These ballots were all cast by the father of Miss Cole. At first, it appears to have been the impression of those keeping tally of the vote that Miss Cole had a plurality without regard to the 50,000 votes which were protested, and her father and the defendant proposed to acquiesce in the rejection of these ballots; but, when further examination indicated that the result of such action would give the plurality to plaintiff, Cole insisted that the ballots be counted. After the protest was made, and during the discussion which followed, Cole exhibited a paper which, he said, was a list of subscribers to correspond to the ballots·cast by him, but he did not deliver it to the canvassers before the canvass was completed and the result announced, though there is evidence to the effect that, at some time later, he did report a list of subscribers to defendant for entry upon his books; but it was not produced on the trial, nor its contents proved. Upon his cross-examination as a witness, defendant admits that, at the time he delivered the ballot box to Collins, or while the box was in the possession of Collins, he told the latter, in substance, ''that if anyone came in with a bunch of money and wanted to put it in the ballot box with the name of a candidate, he (Collins) should accept it''.

The issues having been submitted to the jury, a verdict was returned for plaintiff for $693.30. On the same day, the plaintiff voluntarily remitted all of said amount in excess of $666.50, and judgment for that amount was entered, and defendant appeals.

I.  The defendant complains that the issues were not properly stated to the jury, in that the court did not direct

attention to the affirmative matter pleaded in defense, to which
we have already alluded, to the effect that, by

**1. FRAUD: defenses: shifting responsibility for performance of contract: subscription contest.**
acquiescing in the delivery of the box to
Collins and the selection of judges or canvassers, who counted the same without interference or suggestion by defendant, plaintiff
consented to that manner of ascertaining the majority of votes
cast and was bound thereby.

The matter so pleaded clearly constituted no defense to
plaintiff's action, and the court did not err in omitting to
mention it to the jury. Defendant could not rid himself of
the obligation assumed in organizing the contest and obtaining the services of the candidates by putting the box into the
hands of a third person and saying, ''Here my responsibility
ceases.'' Much less could he thereafter wink at the casting
of large blocks of votes in violation of the rules and regulations which he himself had prescribed for the contest, and
in reliance upon which, plaintiff and others had performed
for him a valuable service. Neither could plaintiff's acquiescence in the selection of the canvassers and the delivery of
the ballot box into their hands deprive her of the right to
protest the counting of ballots which show their invalidity
upon their face. The affirmative matter pleaded in the answer
is at most a pleading of evidence, and not the statement of
a defense.

It is said, however, that there is evidence that plaintiff,
or her husband as her representative, consented that the dispute should be passed upon by the canvassers, and agreed to
submit to their decision. In the first place,

**2. FRAUD: defenses: acquiescence in performance of contract by third party: effect.**
no such agreement is pleaded; and in the
second place, there is no such testimony in
the record. The acquiescence and consent
pleaded in the answer were to the delivery
of the ballot box and contents into the hands of the canvassers, which falls far short of a consent to the counting of
invalid ballots. Again, the only testimony on which it is

claimed a consent of the latter kind.was given is as follows:
One of the canvassers testifies that Smead objected to the
ten ballots because they did not show any subscribers to the
paper, but that such objection was followed by a statement
from Smead "that it was up to·us judges, but he wanted to
tell us how he felt, but that it was up to us to do as we saw
fit". Another of the canvassers did not hear any protest.
The third canvasser was not a witness on the trial. The
statement of Smead to the canvassers that the question was
up to them cannot be reasonably or fairly construed to mean
that he or his wife was ready to submit to the counting of the
protested ballots should the canvassers so decide, and it was
insufficient to take such question to the jury even if the
alleged consent had been pleaded as a defense. As canvas-
sers of the votes, it was, of course, "up to" them to either
count these protested ballots or to reject them, and the
recognition of that fact by the plaintiff could in no manner
estop her from disputing the result if she believed she had
good ground so to do.

II. The appellant excepts to that part of the charge of
the court relating to the issue of conspiracy, because it is said
that there was no evidence of conspiracy before the jury.
The conspiracy charged in this case is in the

3. CONSPIRACY:
evidence: news-
paper subscrip-
tion contest:
fraudulent
casting of
ballots.

nature of a wrongful combination or agree-
ment to manipulate the result of the voting
by admitting to the ballot box ballots not
obtained pursuant to the rules or terms of
the contest, but in clear violation thereof; and while no wit-
ness undertakes to swear to personal knowledge of such agree-
ment or combination, we think the circumstantial evidence
sufficient to justify that inference or conclusion, and the court
did not err in instructing the jury thereon. To say nothing
of other testimony, the fact that defendant told Collins, with
whom he left the ballot box, that, if anyone came along with
a bunch of money to put in the ballot box for some candidate,
he should accept it, and that very soon Cole did appear with

$100 and 50,000 votes to be plumped for his daughter, and that the money and the votes were accepted and deposited in the box, is, of itself, sufficient to overcome this objection which counsel have raised.

III. It is also suggested that, conspiracy having been alleged, the jury should have been told that, if proof thereof failed, plaintiff's action could not be sustained, and that, in such case, the verdict should be for the de-

4. PLEADING: is- fendant.
sue, proof and
variance:               This does not state the correct rule. The
quantum of
proof: breach           plaintiff's petition alleges facts which, if true,
of contract:
conspiracy.             constitute a contract relation with the defend-
ant and a violation of such contract on his part. She also alleges a conspiracy and fraud, by which she says defendant has sought to deprive her of the fruits of her contract with him. Now, as we have had frequent occasion to suggest, the fact that a plaintiff has alleged more than he needs to state to constitute a cause of action does not put upon him the burden of proving everything stated in his petition. If he proves alleged facts which do constitute a cause of action, it is immaterial how many other allegations are unsupported by evidence.

IV. The trial below was had at Primghar, the county seat of the county in which the town of Sheldon is situated. Plaintiff put upon the stand a dealer in automobiles doing

business at Primghar, who was permitted,
5. EVIDENCE:           over defendant's objection, to testify to the
opinion evi-
dence: value:          value of a new Ford automobile of the kind
automobile: lo-
cal value.             which defendant had offered as a prize in his
popularity contest. This ruling was excepted to on the ground that a dealer in Primghar could not be presumed to know the value of such a car at Sheldon. The point thus made is without merit. Primghar and Sheldon are towns in the same county, and it is a matter of common knowledge that the market value of articles entering into the general trade and commerce of the country at large does not vary in any mate-

rial degree, as between dealers and towns in the same general neighborhood. Moreover, it is also a matter of common observation that automobiles are of a class of articles which are quite universally put upon the market through agents and dealers appointed by the manufacturers, under a system by which the market price is everywhere substantially the same, except as it is varied by greater or smaller freight charges. The testimony was competent, and it supports the verdict in that respect.

V. Appellant next complains that the court, having used the words "fraud" and "fraudulent" in its charge, ought to have defined them, and to have told the jury what facts must be found, to constitute fraud.

6. TRIAL: instructions: form, requisites and sufficiency: correct but not explicit: waiver. No request was made for the court to so charge and, as the instructions upon this issue were correct, so far as given, the omission was not erroneous. Fraud is not a word of such technical significance as to require the court, in every case where it is used, to define it. Some reliance may be placed upon the intelligence of the average juror.

VI. It is said that Instruction No. 4, relating to the allegation of conspiracy, is confusing and misleading. We do not find it open to that criticism. The paragraph may not be faultless in structure or expression, but it is not difficult to comprehend the proposition stated by the court.

Other objections to the court's charges were not made in proper time; and even if this were not the case, we find no error in them.

VII. When we get down to the essential points of the case, there is little, if any, room for serious difference of opinion. The defendant instituted the contest, fixing the terms thereof in advance, and invited plain-

7. FRAUD: elements of fraud: violation of contract relations: subscription contest: fraudulent ballots. tiff and others to enter it. As he was enlarging his list in order to enable him to compete for the county printing, it must be presumed (indeed, it should be so presumed in any

event) that he intended that the subscriptions obtained by the contestants should be subscriptions made in good faith. The statute, Code Sec. 441 and Supplement, provides that the list which shall make a newspaper eligible to selection as an official paper shall be of *"bona fide* yearly subscriptions"; and it has been decided by this court that papers or subscriptions given away by the publisher, and subscriptions purchased in blocks or quantities by some individual for papers to be sent to a list of persons designated by him, as a mere gift or advertising scheme, are not *bona fide* subscriptions, within the meaning of the law. *Ashton v. Stoy,* 96 Iowa 197. It is there said that "To become a subscriber to a newspaper includes some voluntary act on the part of the subscriber, or something which is, in effect, an assent by him to the use of his name as a subscriber." That some definition of this nature was in the defendant's mind in announcing the contest is shown by the fact that he there limited the votes to be counted to those earned by collections upon subscriptions either new or renewals or upon past due accounts, and gave notice that "no votes can be bought or otherwise secured". The necessity of such an understanding in advance is very evident; otherwise, no candidate would take up the work, unless she was prepared and willing to measure the length of her purse with those of her competitors and their friends, when the race approached the finish. The blank ballots prepared and furnished the candidates were in such form that, if properly filled, each would show the name and address of the subscriber, the amount paid, whether for new subscription, for renewal, or for past due account, the number of votes and for whom cast. A ballot thus prepared carried upon its face prima-facie evidence of its validity. The ten protested ballots were all alike, and in the following form:

"Ballot.

"Renewal .............. Amount $..........
"Arrears .............. Amount $..........

"New ................. Amount $.....:......

"Total Votes 5,000          Total Amount $10.00

"Send paper to ..............................:.

          "Address ............................

"Votes for Grace Cole."

Omitting the unfilled blanks, the ballot is simply "Total Votes 5,000.   Total Amount $10.00.   Votes for Grace Cole", without any showing or memorandum of any kind as to the account upon which the money was paid, or the identity, name or address of any subscriber to whom the paper was to be sent, or of the person casting the vote.   If this was a valid ballot, then there was nothing to hinder the enthusiastic supporters of the candidates from voting bank bills instead of the prescribed ballots, so long. as the voter pinned to the money a memorandum of the name of his candidate.   Under such circumstances, a contest or competitive effort to enlarge the *bona fide* subscription list of a newspaper, a purpose which in itself is entirely legitimate, degenerates into a mere scramble, in which only "money talks", and "everything goes", as long as the supporters of the candidates are willing to demonstrate their loyalty in terms of cash.   To uphold such a proceeding as legitimate is to say that candidates entering into such contest in good faith, and giving to it weeks or months of effort in strict accordance with the offered terms, must expect to see the promised compensation carried off by any person who may appear at the last moment and cast the necessary amount of money into the balance.   Without attempting to discuss the moral influence and tendency of these enterprises as they appear to common observation, we shall assume that, when fairly conducted, according to the terms and conditions announced at the outset, a contest such as the defendant inaugurated is open to no legal objection.   It follows, therefore, that the publisher offering the prize and the candidates entering the contest assume mutual obligations and duties which the law will recognize and enforce, and

the candidate who, when the ballot is closed, is shown to have earned the largest vote in accordance with the rules is entitled to demand and receive the promised reward. It is made the candidates' duty to solicit and obtain *bona fide* subscriptions and collect *bona fide* past due accounts and none other, and when these are duly reported and accounted'for, each is entitled to demand and receive credit in the specified number of votes, and no more. There is nothing in the terms of the offer in this case by which the defendant could empower or authorize the canvassing board to count and give effect to ballots which were manifestly invalid. The only mention of such board in the published announcement was: "At the close of the contest, the records will be checked by clerks from some of the local banks, and a verified statement will be published." The duty of such board or committee was purely ministerial, and it could no more permit the terms of the contest to be ignored than could the defendant himself. For reasons already stated, the ten protested ballots, aggregating 50,000 votes, were invalid, and should not have been counted. The fact that, *after the protest had been made,* Cole said that he had a list of subscribers and showed a paper which he said was the list, and the fact, if it be a fact, that he then or thereafter furnished such list to defendant, are wholly immaterial. If the ballots *when cast, or when the contest was closed and the voting ceased, were fatally defective or invalid, the objection thereto could not be cured by anything done or offered to be done after the box was opened and the counting begun.* Indeed, even if the alleged list of names had accompanied the ballots, and they were not of subscribers in any proper sense of the word, but simply a list prepared by or for Cole, of persons to whom he was voluntarily sending the paper at his own expense, then such ballots did not conform to the terms of the contest and should have been excluded from the count upon the objection of any candidate. It is significant that Cole himself does not testify in the case, nor is any list of subscribers represented by his payment of $100

produced or offered in evidence by him or by the defendant.

Without going further into the record, it is enough to say, in conclusion, that plaintiff made a case for the jury, and the verdict finds abundant support in the record. That the questions presented are practically all of matters of fact is recognized by counsel, who, except upon some collateral propositions, have cited no authorities for our consideration. Indeed, the law applicable to the issues is too familiar and elementary to justify discussion.

There is no reversible error in the record shown, and the judgment of the district court is—*Affirmed.*

DEEMER, C. J., EVANS and PRESTON, JJ., concur.